**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

KARISHA EDDINGTON,

              Plaintiff,

vs.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

              Defendant.

No. C 14-3018-MWB

**MEMORANDUM OPINION AND
ORDER ON JUDICIAL REVIEW OF
DENIAL OF PLAINTIFF'S
APPLICATION FOR SOCIAL
SECURITY DISABILITY BENEFITS**

---

**TABLE OF CONTENTS**

I.   **INTRODUCTION**............................................................ 2
    A.   *Background*............................................................ 2
    B.   *Disability Determinations And The Burden Of Proof* ...................... 3
    C.   *The ALJ's Findings* ................................................... 6

II.  **LEGAL ANALYSIS** ..................................................... 8
    A.   *The Substantial Evidence Standard* .................................... 8
    B.   *Discussion*.......................................................... 10
        1.   *Medical opinions and severe impairments*......................... 10
            a.   *Applicable standards* ...................................... 10
            b.   *Medical and opinion evidence* ............................... 14
            c.   *The ALJ's findings* ........................................ 18
            d.   *Analysis* .................................................. 23
        2.   *Evaluation of subjective allegations* ................................ 28
            a.   *Applicable standards* ...................................... 28
            b.   *The ALJ's findings* ........................................ 30
            c.   *Analysis* .................................................. 32

III.  **CONCLUSION** ....................................................... 36

This matter is before me pursuant to Karisha Eddington's application for Disability Insurance benefits under Title XVI of the Act, 42 U.S.C. § 401 *et seq*. Eddington seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for benefits. Eddington argues that the administrative record (AR) does not contain substantial evidence to support the Commissioner's decision that she was not disabled during the relevant period of time.

## I. INTRODUCTION
### A. Background

Eddington was 22 years old on her alleged onset date. (At the time of the ALJ's decision, she was 26 years old.) Eddington completed high school, where she took some special education classes, and attended some college. She is not married and has no children. She has a spare work history, including stints in fast food restaurants and as a hotel maid. Eddington has mostly lived at home, with one or both of her parents. However, she has also, at times, lived with her boyfriend.

Eddington filed her application for disability benefits on October 2, 2008. Eddington alleged she became disabled on September 12, 2004. The Social Security Administration denied Eddington's application initially and upon reconsideration. Eddington appeared for a hearing before Administrative Law Judge (ALJ) Robert Labrum in 2010. ALJ Labrum issued a decision denying benefits on October 19, 2010. Eddington requested review and, on June 8, 2012, the Appeals Council remanded Eddington's claim for a supplemental hearing. Eddington appeared for a second hearing before ALJ Thomas M. Donahue on October 16, 2012. On January 31, 2013, the ALJ again denied Eddington's claim. Eddington appealed the ALJ's decision, but the Appeals Council denied review. Eddington timely filed the present case on March 31, 2014.

On October 21, 2014, Judge O'Brien held a hearing on Eddington's complaint. Unfortunately, Judge O'Brien passed away before issuing a ruling and this case was reassigned to me. I have reviewed the record, along with the audio recording of the hearing, and now enter the following.

### B.    *Disability Determinations And The Burden Of Proof*

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the

3

claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity (RFC) to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or,

in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must show not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. § 416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### C.    *The ALJ's Findings*

In this case, the ALJ applied the appropriate methodology and found:

(1)    The claimant has not engaged in substantial gainful activity since October 2, 2008, the application date (20 C.F.R. § 416.971 *et seq.*).

(2)    The claimant has the following severe impairments: pain in the left shoulder joint; a personality disorder; major depressive disorder; anxiety disorder; attention deficit-hyperactivity disorder (20 C.F.R. § 416.920(c)).

(3)    The claimant's impairments are severe, in combination if not singly, (20 C.F.R. § 404.1520(c) and § 416.920(c)), in that the claimant is significantly affected in the ability to perform basic work activities (20 C.F.R. §§ 404.1521(b) and 416.921(b)).

(4)    The claimant's history of marijuana use and current alcohol use do not cause more than minimal limitations in her ability to perform basic work activity.  As such, the claimant's substance abuse is found not material to the determination of disability.

(5)    The claimant does not have an impairment or combination of impairments that  meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§§ 416.920(d), 416.925 and 416.926).

(6)    The claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06.

(7)    Applying "paragraph B," the claimant has no difficulties in the activities of daily living, moderate difficulties in social functioning, moderate difficulties with regard to concentration, persistence or pace; and no episodes of decompensation.    Because the

claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

(8)     The "paragraph C" criteria have not been satisfied. Specifically, the record is devoid of evidence establishing repeated episodes of decompensation of extended duration or residual disease process where increased mental demands would be predicted to cause the claimant to decompensate. Additionally, the claimant does not have a history showing an inability to function outside of a highly supportive living arrangement.

(9)     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. § 416.967(c) such that she could lift 50 pounds occasionally and 25 pounds frequently. She could sit and walk for two hours at a time for at least six of an eight-hour day, and could walk for three blocks. She would be limited to simple routine tasks and would need an SVP of 2.

(10)    The objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations. More specifically, the medical findings do not support the existence of limitations greater than the above listed residual functional capacity. The claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(11)  The claimant inconsistently sought treatment and failed to follow up on doctor's instructions. The claimant also is able to perform the activities of daily living, including taking care of her ailing mother.

(12)  The psychological evaluation performed by Dr. Eva Christiansen was entitled to little weight because it was inconsistent with the record as a whole.

(13)  The assessments of Dr. Rogers and Dr. Bonnstetter were entitled to some weight.

(14)  The third party evaluations provided by claimant's family were not credible.

(15)  Claimant is able to perform past relevant work in the fast food industry.

(16)  As an alternate Step 5 finding, based on the testimony of the vocational expert, and considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.

(17)  The claimant was not under a disability, as defined in the Social Security Act, from October 2, 2008, through the date of this decision (20 C.F.R. § 404.1520(f) and 20 C.F.R. § 416.920(f)).

AR 11-24.

## II.  LEGAL ANALYSIS

### A.  The Substantial Evidence Standard

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial

evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645. The Eighth Circuit explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th

Cir. 2008)).  This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)).  The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## B.    Discussion

Eddington contends the ALJ's decision is flawed for two reasons:

1.    The ALJ erred in giving little weight to the opinions of Dr. Bonnstetter and Dr. Christiansen in concluding that Eddington's severe impairments did not meet a listing criteria and that she had the RFC to return to work.

2.    The ALJ erred in finding that Eddington's subjective allegations were not fully credible.

(docket no. 11)

### 1.    *Medical opinions and severe impairments*

#### a.    *Applicable standards*

As discussed above, at Step Two, the ALJ must consider whether a medically determinable impairment is "severe."  20 C.F.R. § 404.1520(a)(4)(ii).  A severe impairment is one which "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; capacities for seeing, hearing and speaking; understanding, carrying out and remembering simple instructions; use of judgment; responding

appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). If the impairment would have no more than a minimal effect on the claimant's ability to work, it is not severe. *Page*, 484 F.3d at 1043. If the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley,* 133 F.3d at 588. If the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4). The claimant's RFC is "what [the claimant] can still do" despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a)(1). "The ALJ must determine a claimant's RFC based on all of the relevant evidence." *Fredrickson v. Barnhart,* 359 F.3d 972, 976 (8th Cir. 2004). The claimant's RFC "is a medical question," *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001), and must be supported by "some medical evidence." *Dykes v. Apfel,* 223 F.3d 865, 867 (8th Cir. 2000) (per curiam). The medical evidence should address the claimant's "ability to function in the workplace." *Lewis,* 353 F.3d at 646. The RFC determination is not based exclusively on the medical evidence, or on any one physician's opinion, but on the record as a whole. *Cox v. Astrue,* 495 F.3d 614, 619 (8th Cir. 2007). While the RFC assessment draws from medical sources, it is ultimately an administrative determination reserved to the Commissioner. *Id.*

"An ALJ must not substitute his opinions for those of the physician." *Finch,* 547 F.3d at 938 (quoting *Ness v. Sullivan,* 904 F.2d 432, 435 (8th Cir. 1990)). Rather, "it is the ALJ's responsibility to determine [the] claimant's RFC based on all the relevant

evidence, including medical records, observations of treating physicians and others, and claimant's own description of her limitations." *Jones v. Astrue,* 619 F.3d 963, 971 (8th Cir. 2010) (citing *Page,* 484 F.3d at 1043). "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government if they are inconsistent with the record as a whole." *Pearsall v. Massanari,* 274 F.3d 1211, 1219 (8th Cir. 2001). "An ALJ's failure to consider or discuss a treating physician's opinion that a claimant is disabled is error when the record contains no contradictory medical opinion." *Hogan v. Apfel,* 239 F.3d 958, 961 (8th Cir. 2001) (citing *Black v. Apfel,* 143 F.3d 383, 386 (8th Cir. 1998)). The ALJ is not required to mechanically list and reject every possible limitation. *McCoy v. Astrue,* 648 F.3d 605, 615 (8th Cir. 2011). Furthermore, "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Wildman v. Astrue,* 596 F.3d 959, 966 (8th Cir. 2010) (quoting *Black v. Apfel,* 143 F.3d 383, 386 (8th Cir. 1998)).

Medical opinions can come from a treating source, an examining source, or a non-treating, non-examining source (typically a state agency medical consultant who issues an opinion based on a review of medical records). Medical opinions from treating physicians are entitled to substantial weight. *Singh v. Apfel,* 222 F.3d 448, 452 (8th Cir. 2000). A treating physician's opinion "does not automatically control or obviate the need to evaluate the record as [a] whole." *Leckenby v. Astrue,* 487 F.3d 626, 632 (8th Cir. 2007). Nonetheless, if the ALJ finds that a treating physician's medical opinion as to the nature and severity of the claimant's impairment is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] record, [the ALJ] will give it controlling weight." 20 C.F.R. § 416.927(c)(2). "When an ALJ discounts a treating physician's opinion, he should give good reasons for doing so." *Brown v. Astrue,* 611 F.3d 941,

951–52 (8th Cir. 2010). Note, however, that a treating physician's conclusion that an applicant is "disabled" or "unable to work" addresses an issue that is reserved for the Commissioner and, therefore, is not a "medical opinion" that must be given controlling weight. *Ellis v. Barnhart,* 392 F.3d 988, 994 (8th Cir.2005).

At the other end of the medical-opinion spectrum are opinions from non-treating, non-examining sources: "The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." *Shontos v. Barnhart,* 328 F.3d 418, 427 (8th Cir. 2003). This does not mean, however, that such opinions are to be disregarded. Indeed, "an ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." *Prosch v. Apfel,* 201 F.3d 1010, 1014 (8th Cir. 2000) (internal quotations and citations omitted). Unless a treating source's opinion is given controlling weight, the ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant." 20 C.F.R. § 416.927(e)(2)(ii).

In the middle of the spectrum are opinions from consultative examiners who are not treating sources, but who examined the claimant for purposes of forming a medical opinion. Normally, the opinion of a one-time consultative examiner will not constitute substantial evidence, especially when contradicted by a treating physician's opinion. *Cantrell v. Apfel,* 231 F.3d 1104, 1107 (8th Cir. 2000).

Ultimately, it is the ALJ's duty to assess all medical opinions and determine the weight to be given these opinions. *See Finch,* 547 F.3d at 936 ("The ALJ is charged with the responsibility of resolving conflicts among medical opinions."); *Estes v. Barnhart,* 275 F.3d 722, 725 (8th Cir. 2002) ("[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'") (citing *Bentley v. Shalala,* 52 F.3d 784, 785–87 (8th Cir. 1995)).

### b.    *Medical and opinion evidence*

The medical record in this case is sparse and largely limited to evaluations conducted for the purpose of disability determination.    Although the record makes mention of various records that pre-date the application period, the first relevant medical evidence contained in the record is an evaluation performed by Dr. Melanie Bonnstetter, Psy. D.    The Commissioner referred Eddington to Dr. Bonnstetter for a mental evaluation, which was conducted on December 5, 2008.    At that time, Eddington was 22 years old.    Eddington reported to Dr. Bonnstetter that she did have a primary care provider and her exclusive medication was a birth control shot.  AR 458.  Dr. Bonnstetter reviewed the medical records, interviewed Eddington and her parents, and performed various tests.    Of significance, Eddington admitted to Dr. Bonnstetter that she had two or three jobs from which she had been fired because "she gets bored or doesn't feel that things are fair and as a result becomes argumentative or agitated."    AR 455.    Dr. Bonnstetter found that "patient's personality functioning is more directly impeding her ability to work than problems with ADHD and/or intellectual capacity.    It is this examiner's opinion that the patient has learned how to ensure her wants/needs are met by her parents to the point that she is not properly motivated to seek or maintain employment."  AR 460.  Regarding her ADHD, Eddington reported to Dr. Bonnstetter that she had discontinued taking her medication because she didn't want to be dependent on pills.  AR 457.  Dr. Bonnstetter tested Eddington's IQ and gave her a full IQ score of 88, which means that Eddington had an IQ in the low average range of intellectual functioning.  AR 460.  Dr. Bonnstetter assigned her a GAF score of 55, but noted that Eddington was not taking any medication which could potentially improve her condition.[1] AR 459-460.

---

[1] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school or occupational settings, not including impairments due to

Myrna Tashner, Ed.D., another agency expert, examined the record and provided a functional capacity assessment on December 26, 2008. Tashner stated that Eddington's functional capacity did not meet or exceed the listings. AR 464. In coming to that conclusion, Tashner cited the fact that Eddington was not currently treating for any ongoing medical or mental issues and that she could take care of herself on a daily basis. AR 464.

Sometime in 2010, Eddington fell and injured her shoulder. Her local health care provider referred her to the University of Iowa Hospital. AR 516. She appeared at the University of Iowa Hospital for an evaluation on July 1, 2010. The University of Iowa Hospital did not find any acute issue with the shoulder, and recommended conservative treatment with pain medication. AR 502. Also in 2010, Eddington presented at the Community Health Center in Fort Dodge for a variety of routine medical issues, including ear pain and gastrointestinal issues. AR 509-515. In only one instance does it appear depression was noted by the doctor. AR 511.

On January 10, 2010, Eddington saw Teresa Anderson, MS, a counselor in Fort Dodge, Iowa.[2] AR 525. Anderson diagnosed Eddington with major depressive disorder

---

physical or environmental limitations. *See* American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed.) (DSM–IV). On the GAF scale, numerically higher numbers represent better social functioning, while lower scores represent poor functioning. For example, a GAF score of 41 to 50 indicates the individual has serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or a serious impairment in social, occupational or school functioning (*e.g.*, no friends, unable to keep a job). *Id*. A GAF score of 51 - 60 indicates moderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id*.

[2] It seems from the text of the counselor's note that this was a follow up appointment, but the administrative record does not document what prior relationship Eddington and Anderson had.

and borderline personality disorder. Anderson assigned Eddington a GAF score of 55-60 and directed Eddington to a support group. *Id*. Anderson also recommended individual therapy sessions and directed Eddington to follow up with her primary care provider regarding her prescriptions. AR 525. Anderson also noted that Eddington took the prescription Pristiq for depression. *Id*.

On April 5, 2011, Dan Rogers, Ph.D. evaluated Eddington following a referral from the Commissioner. Apparently the medical records available to Rogers was the note from Teresa Anderson, described above. Accordingly, Rogers relied primarily on the in-person evaluation. Rogers noted that, "[a]lthough [Eddington] used the word 'depressed' to describe her usual mood she actually described boredom, lack of spending money, and concern for her parents, but she did not describe lengthy periods of sadness or other symptoms of depression. . . She also did not describe symptoms of borderline personality." AR 529. Rogers assigned Eddington a GAF score of 65 and concluded that, "[t]here are no apparent signs of serious mental disorder for [Eddington]." AR 530.

On May 24, 2011, Eddington sought a disability evaluation at Trimark Family Practice in Fort Dodge, Iowa. AR 497. Dr. Michael Stitt concluded the claimant's major problem appeared to be anger management or adult oppositional disorder of some sort. AR 498. Dr. Stitt stated that, "[t]here is no[t] much on the physical exam to indicate problems with the shoulder knee or feet." *Id*.

On July 22, 2011, Dennis Weis, M.D., performed a record review for the agency, as did Jennifer Ryan, Ph.D., on July 25, 2011. AR 536-537. Neither found significant limitations or any reason to reverse the previous agency findings that Eddington is not disabled. *Id*.

Eddington presented at the Community Health Center in Fort Dodge for several more normal health checks in 2011 and 2012, including for a rash (AR 541), a sinus

infection (AR 543-544), and bronchitis (AR 566). On October 14, 2011, Eddington injured her toes. An x-ray revealed no serious damage and the attending doctor directed Eddington to take over-the-counter pain medication. AR 571-572. On June 20, 2012, Eddington sought treatment for elbow pain after playing video games. The attending doctor prescribed her pain medication. AR 560-562. On September 12, 2012, Eddington sought treatment for rib pain and was prescribed pain medication. AR 555-556.

Eddington saw counselor Teresa Anderson, again, on July 19, 2012. AR 552. Eddington told Anderson that she was experiencing increased symptoms of depression and anxiety. Eddington noted that she stopped taking her depression medication and asked to be re-started on it. AR 551. Anderson diagnosed Eddington with panic disorder without agoraphobia, major depressive disorder, relationship issues, and chronic, intermittent, pain. AR 553. Anderson assigned Eddington a GAF score of 51-55 and referred her for a psychiatric evaluation. *Id.*

Pursuant to the referral from counselor Anderson, Eddington appeared at the Berryhill Center for Mental Health in Fort Dodge, Iowa, on August 9, 2012. Dr. Maria Lozano Celis examined Eddington. Dr. Celis noted that Eddington had previously been evaluated at Berryhill in 2008. AR 547. Dr. Celis noted that, during that previous disability evaluation, Dr. Melanie Porter had diagnosed Eddington with ADHD, depression, and personality disorder. *Id*. Dr. Celis diagnosed recurrent, moderate, depressive disorder, childhood onset ADHD, possible personality disorder, and assigned Eddington a GAF score of 50. AR 549. Dr. Celis recommended that Eddington restart the depression medication Pristiq and attend a follow-up therapy session. AR 549.

On October 10, 2012, Dr. E. Christiansen, Ph.D., conducted a psychological evaluation of Eddington. Based on his examination of Eddington, along with a review of the medical records, Dr. Christiansen diagnosed Eddington with Dysthymia with episodes of major depression, anxiety disorder, ADHD, mixed personality disorder, and

assigned Eddington a GAF score of 50. AR 579-580. Regarding her ability to work, Dr. Christiansen concluded:

> Ms. Eddington's ability to remember and understand instructions and procedures should be adequate for her to handle complex tasks, with no indication that she has ever functioned at her most competent, and some indications that without supervision she does not complete basic tasks competently. She may perform less adequately when competence at academic tasks is required. Attention and concentration are challenged and likely to be adequate only when high-interest activities are present. Pace has been noted to be slow. Various sources for this slowness are possible and not well specified by these procedures. Relationships to others have been conflictual [*sic*] and ambivalent, with much difficulty coping with relationship loss or in earlier years feelings of abandonment. Judgment is questionable. She should have the ability to adjust to changes in the environment.

AR 580.

### c. *The ALJ's findings*

The ALJ evaluated Eddington's RFC and found as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. § 416.967(c) such that she could lift 50 pounds occasionally and 25 pounds frequently. She could sit and walk for two hours at a time for at least six of an eight-hour day, and could walk for three blocks. She would be limited to simple routine tasks and would need an SVP of 2. In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 416.929 (incorporating and expanding upon *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984)) and SSRs 96-4p and 96-7p. The

undersigned has also considered opinion evidence in
accordance with the requirements of 20 C.F.R. 416.927 and
SSRs 96-2p, 96-5p, 96-6p and 06-3p.

AR 13.[3]  In weighing the medical evidence, the ALJ stated:

> Turning to the medical evidence, the objective findings in this
> case fail to provide strong support for the claimant's
> allegations of disabling symptoms and limitations.  More
> specifically, the medical findings do not support the existence
> of limitations greater than the above listed residual functional
> capacity.

AR 14.

The ALJ then discussed each medical record individually.  The ALJ summarized

the opinion of Dr. Bonnstetter, as follows:

> Due to the paucity of treatment, the claimant was referred by
> the agency for consultative psychological evaluation
> performed by Melanie Bonnstetter, Psy. D., in December of
> 2008 (Exhibit 2F).  While in the waiting room prior to the
> evaluation, the psychologist noted that the claimant was acting
> immaturely, balking at the fact that she would be required to
> undergo two hours of evaluation and demanded that her
> parents go get her some type of food because she could not
> go that long without eating.  After initiating the evaluation,
> the claimant apologized for her behavior, stating that she had
> difficulties dealing with her parents due to the fact that they
> are always telling her what to do.  During the evaluation, the
> claimant reported that she was filing for disability upon the
> encouragement of her parents, who apparently did not believe

---

[3] Previously, at Step Three, the ALJ found that Eddington had only moderate limitations
under "paragraph B" and no episodes of decompensation under "paragraph C."
Accordingly, the ALJ found that Eddington had, at most, moderate limitations regarding
her mental impairments.  AR 12-13.  As will be discussed more, below, the ALJ also
found Eddington's own statements about the limited nature of her medical impairments
persuasive.  AR 21.

she was capable of holding down a job. The claimant reported being fired from previous jobs because she gets bored or does not feel that things are fair and becomes argumentative or agitated. She reported a history of ADHD and difficulties being around people in general because she did not like being told what to do, noting that she would become belligerent, yells, and occasionally has hit walls or damaged property. She denied any psychiatric hospitalizations and reported previously being on Ritalin for treatment of ADHD as a child. She reported graduating from high school describing herself as a B/C student and attended one year of college, noting that she left college due to issues with her boyfriend. Regarding her typical day, the claimant reported watching television, playing video games, going to the mall with friends, and hanging out with family.

On mental status examination, the claimant had good personal hygiene and eye contact. She appeared easily bored and talked randomly about various stressors in her life. She was fully oriented, her mood was euthymic, and her affect was congruent. She spoke clearly and coherently, without evidence of psychotic symptoms. Notably, she was able to recall three of three items both immediately and following a five-minute delay. She was able to complete serial threes but refused to perform serial sevens. Her judgment and impulse control were adequate in session and she denied any current suicidal thoughts. On WAIS-III testing, the claimant obtained a Verbal Score IQ of 91, a Performance Score IQ of 86, and a Full Scale Score IQ of 88, which was noted to be in the low average range of intellectual abilities. Based on the evaluation, the psychologist diagnosed the claimant with ADHD, predominately inattentive type (provisional diagnosis), history of oppositional defiant disorder, personality disorder, not otherwise specified (cluster B traits primary diagnosis), and a Global Assessment of Functioning (GAF) score of 55. The GAF score is a clinician's rating, of an individual's overall psychological, social and occupational functioning, on a scale of O to 100. A rating of 55 indicates moderate symptoms or moderate difficulty in social,

occupational, or school functioning (See, American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision pg. 34, 2000). The psychologist further found that the claimant's "personality functioning is more directly impeding her ability to work than problems with ADHD and/or intellectual capacity." In addition, the psychologist noted that the claimant had learned to ensure her needs [were met] through her parents and found she was "not properly motivated to seek or maintain employment." Functionally, the psychologist opined that the claimant would be able to pick up on social cues and respond appropriately if she would choose to do so. In addition, it was found that the claimant would quickly decompensate [when] treated unfairly or in a hostile manner, which would impact her ability to use good judgment and respond appropriately to changes in the workplace. Further, the psychologist opined that, "she will be able to remember and understand instructions and procedures. Her ability, however, to carry out instructions, concentrate or maintain a reasonable pace largely depends upon her interest in the activity at hand, her motivation to maintain the employment and the relationship that she is able to establish with her supervisor or employer. She can be expected to have difficulties interacting appropriately with supervisors or employers who are fairly rigid or who tend to have a more confrontational style."

AR 16-17. Regarding Dr. Christiansen, the ALJ stated:

The psychologist found that the claimant's intellectual functioning appeared consistent with prior testing, indicating functioning in the low average range. Of note, the psychologist reported some inconsistencies between the claimant's historical records and her reported history, noting that she had previously reported quitting college due to boyfriend problems but stated during the current interview that she stopped because she was no longer interested in the course of study. The psychologist found the evaluation to be consistent with problems including depressive issues, anxiety beginning in childhood, and difficulties managing emotional

21

reactions due to personality disorders. Based on this evaluation, Dr. Christiansen reported diagnoses of dysthymia, with exacerbations to major depressive disorder episodes, anxiety disorder, ADHD, mixed personality disorder, and a GAF score of 50. Regarding the claimant's ability to perform work related activities, the psychologist opined that the "ability to remember and understand instructions and procedures should be adequate for her to handle complex tasks, with no indication that she has ever functioned at her most competent, and some indications that without supervision she does not complete basic tasks competently. She may perform less adequately when competence at academic tasks is required. Attention and concentration are challenged and likely to be adequate only when high-interest activities are present. Pace has been noted to be slow. Various sources for this slowness are possible and not well specified by these procedures. Relationships to others have been conflictual [*sic*] and ambivalent, with much difficulty coping with relationship loss or in earlier years feelings of abandonment. Judgment is questionable. She should have the ability to adjust to changes in the environment." Dr. Christiansen opined that the claimant's "disorders are disabling because of the overall context of her personality functioning, which takes place at a primitive, borderline level that interferes with her taking on independent adult responsibilities."

AR 19. The ALJ weighed the various medical opinions and concluded:

Based on the longitudinal mental health findings of record, the undersigned has afforded the opinions of Dr. Christiansen little weight, as the finding that the claimant was "disabled" appeared generally inconsistent with those of the other examining psychologists of record. More specifically, mental status evaluations of record indicated generally normal evaluations, with the claimant having intact attention and concentration, and adequate judgment and impulse control during the evaluations (See Exhibits 2F; 13F). Furthermore, the claimant's psychiatrist noted a fairly normal mental status evaluation, including intact memory, attention and

concentration within normal limits, ability to perform abstract thinking, and fair judgment (Exhibit 19F). Notably, Dr. Rogers found no apparent signs of a serious mental disorder, noting that she did not appear depressed, did not have a disabling mental disorder, and no learning disability was evident during the interview (Exhibit 13F, pg. 4). Additionally, Dr. Bonnstetter found that the claimant was "not motivated to seek or maintain employment[,"] indicating that the claimant could carry out instructions and maintain concentration when motivated and interested. Consistent with the findings of Dr. Rogers, Dr. Bonnstetter noted that the claimant could respond appropriately in social settings if she chose to do so (Exhibit 2F, pg. 25). Furthermore, the findings were inconsistent with the claimant's self-reported daily activities, indicating that the claimant functioned independently on a daily basis, inconsistent with the report of Dr. Christiansen (Exhibit 8E; Hearing Testimony). Based on the foregoing, the undersigned has afforded little weight to the opinions of Dr. Christiansen and some weight to the opinions of Dr. Bonnstetter and Dr. Rogers.

AR 19-20.

### d. Analysis

Eddington's first argument is that the ALJ erred in giving little weight to the opinions of Dr. Bonnstetter and Dr. Christiansen in concluding that her severe impairments did not meet a listing criteria and that she had the residual functional capacity to return to work. In making that argument, Eddington alleges that: 1) the opinions and work-related limitations from Dr. Bonnstetter and Dr. Christiansen are materially different from the ALJ's mental residual RFC assessment; 2) the ALJ failed to evaluate the opinions of Dr. Bonnstetter at all; 3) the ALJ's decision is internally inconsistent regarding Eddington's ability to maintain attention and concentration; and 4) the opinions from Dr. Christiansen and Dr. Bonnstetter are consistent with the record as a whole while the ALJ's findings are not supported by substantial evidence in the record as a whole.

The second of those claims is clearly without merit. As quoted immediately above, the ALJ devoted several paragraphs of his opinion to discussing and weighing the records provided by Dr. Bonnstetter. Accordingly, I will only discuss Eddington's other three points. At the outset of my analysis, I repeat the observation of the ALJ that this case presents a unique situation in that the medical record is almost completely devoid of treatment notes, especially related to the severe impairments. Rather, the administrative record is comprised almost entirely of various evaluations conducted specifically for the purpose of Eddington's pending disability claim. Thus, this case is far removed from the 'normal' RFC case, where the arguments primarily relate to whether the medical source conclusions, and the ALJ's RFC finding, are supported by the treatment notes.

Eddington's first point is that the ALJ's RFC determination is materially different from the opinions of Dr. Bonnstetter and Dr. Christiansen. However, this argument is paradoxical, because Dr. Bonnstetter and Dr. Christiansen's opinions are materially different from each other. Dr. Christiansen is, without a doubt, the least conservative in diagnosing Eddington, offering the conclusion that Eddington is completely disabled. Meanwhile, the overarching conclusion of Dr. Bonnstetter's evaluation is that, although Eddington has low-average intelligence, "the patient's personality functioning is more directly impeding her ability to work than problems with ADHD or intellectual capacity. . . . [T]he patient has learned how to ensure her wants/needs are met by her parents to the point that she is not properly motivated to seek or maintain employment." AR 460. Dr. Bonnstetter went on to say that, "[Eddington] is able to pick up on social cues and respond to them appropriately when and if she chooses. . . ." *Id*.

In weighing Eddington's mental impairments, the ALJ found that she had moderate difficulties in social functioning and moderate difficulties with regard to concentration, persistence, and pace. AR 12. Those limitations seem to be somewhat more than what Dr. Bonnstetter observed, but somewhat less than what Dr. Christiansen observed. It is

true that the ALJ's RFC is not a direct reflection of either medical opinion. But, there is no requirement under the law that the ALJ must adopt the report of one particular doctor, especially when, as is the present case, neither doctor was Eddington's treating source. Rather, as pointed out by the Commissioner, "the ALJ does not base his residual functional capacity determination on any one physician's opinion, even a treating physician's opinion, but he bases it on the record as a whole. *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)." (docket no. 12, p. 7) The fact that the ALJ's RFC is different from either Dr. Bonnstetter or Dr. Christiansen's assessment does not mean that it is not supported by substantial evidence in the record.

The next point raised by Eddington is that the ALJ made contradictory findings regarding her ability to maintain concentration. Specifically, Eddington argues that the ALJ cannot, on one hand, recognize that Eddington has the severe impairment of ADHD, while, on the other hand, finding Eddington had normal concentration, because ADHD necessarily impairs attention and concentration.

There are a number of problems with this argument. There is a legally significant difference between the initial finding of a severe impairment and the RFC finding regarding the extent said impairment impacts the claimant. The mere fact that the claimant is diagnosed with what constitutes a severe impairment does not mean that impairment will render the claimant disabled. The country is full of individuals who have what could be severe impairments, such as asthma, obesity, or diabetes, but have never even considered seeking benefits because their symptoms are not limiting. Thus, the mere fact that the ALJ recognized that Eddington has the severe impairment of ADHD, but did not find that the ADHD caused a marked limitation is not, in and of itself, an error. Rather, the proper function of the ALJ in crafting an RFC is to determine

whether the claimant has the ability to function in spite of her impairments. That is exactly what the ALJ did in this case.[4]

Additionally, there is a factual inconsistency in Eddington's argument. As set out in her brief, Eddington argues that, "according to the ALJ, the claimant had intact attention and concentration. (TR 19)." (docket no. 11, p. 13) The citation provided by Eddington for that contention is page 19 of the ALJ's order. On page 19 of his order, the ALJ does state that the claimant has "intact attention and concentration." AR 19. However, that statement is in reference to a previous medical opinion in the record. It is not the ALJ's conclusion. Rather, as was noted above, the ALJ concluded that Eddington had moderate limitations with regard to attention and concentration. Thus, there is no inconsistency in the ALJ's order. He noted a severe impairment of ADHD and found that the ADHD had a moderate impact on Eddington's concentration and attention.[5]

Eddington's final point is the catch all argument that the ALJ's medical assessment and RFC are not supported by substantial evidence. Eddington specifically attacks the ALJ's decision to give little weight to the opinion of Dr. Christiansen. Eddington argues that the ALJ should have found her to have poor judgment and impulse control in crafting the RFC. The Plaintiff argues that if the ALJ had properly credited Dr. Christiansen's opinion, the RFC would have included those additional limitations.

---

[4] As was stated above, Dr. Bonnstetter specifically downplayed Eddington's ADHD, finding that her personality had a larger impact on Eddington's functioning than her illness did.

[5] It is also worth noting that not all the doctors of record diagnosed Eddington with ADHD. Dr. Rogers examined Eddington without access to the records that showed Eddington had been diagnosed with ADHD in her youth. Lacking that prior diagnosis, Rogers did not find Eddington to have ADHD. AR 528-530.

The simple fact that Dr. Christiansen provides an opinion contrary to the RFC does not mean the RFC is invalid. My role is not to reweigh the evidence, but to determine if the ALJ's conclusion is supported by substantial evidence. In this case, it is. First, Dr. Christiansen is merely a consulting physician. Even though Dr. Christiansen examined Eddington, Dr. Christiansen is not entitled to the deferential weight provided to a long term provider. This is especially true when it appears that the provider is an outlier whose opinion was sought simply for the purposes of bolstering a disability claim. There simply is no legal rationale which would compel the ALJ to give Dr. Christiansen controlling weight in spite of the contrary opinions from the other medical sources.

Second, the ALJ meticulously cites the medical record in support of his RFC finding. As was stated above, several times, the ALJ's RFC relied, in part, on the opinion of Dr. Bonnstetter, who found that 'motivation' and 'personality' where Eddington's biggest issues. AR 20. The ALJ noted that Dr. Celis found "claimant's memory, attention, and concentration were . . . intact and within normal limits." AR 18. The ALJ also cited to Dr. Rogers who stated that, although Eddington considered herself depressed, "she actually described boredom. . ." AR 17. The ALJ cites the fact that Dr. Rogers found no serious mental limitations and assigned Eddington the relatively healthy GAF score of 65. Similarly, the ALJ stated that, although counselor Anderson diagnosed Eddington with a variety of issues, Anderson cited 'grief' as a major component of Eddington's sadness and assigned her a GAF score of 55-60. AR 17. Finally, as will be discussed more below, the ALJ cited Eddington's inconsistent treatment and lack of medication to support his RFC. Based on the foregoing, it is clear that the medical component of the ALJ's RFC is supported by substantial evidence.

## 2. Evaluation of subjective allegations

### a. Applicable standards

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). Accordingly, the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). An ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole. *Id.*

To determine a claimant's credibility, the ALJ must consider:

    (1)    the claimant's daily activities;

    (2)    the duration, intensity, and frequency of pain;

    (3)    the precipitating and aggravating factors;

    (4)    the dosage, effectiveness, and side effects of medication; and

    (5)    any functional restrictions.

*Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). "'Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility.'" *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001)). However, the Eighth Circuit Court of Appeals has repeatedly stated that "the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." *Hogg v. Shalala*, 45 F.3d 276, 278-79 (8th Cir. 1995) (citing *Harris v. Sec'y of Dep't of Health and Human Servs.*, 959 F.2d 723, 726 (8th Cir. 1992)). A claimant need not prove she is bedridden or completely helpless to be found disabled. *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005). Yet, the Eighth Circuit Court of Appeals has also held that "cooking, vacuuming, washing dishes, doing

laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain." *Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009).

With respect to determining whether activities of daily living are inconsistent with subjective complaints of disability, the ALJ must consider the "quality of the daily activities and the ability to sustain activities, interest, and relate to others over a period of time and the frequency, appropriateness, and independence of the activities." *Wagner v. Astrue*, 499 F.3d 842, 852 (8th Cir. 2007) (citing *Leckenby v. Astrue*, 487 F.3d 626, 634 (8th Cir. 2007)). "Other relevant factors include the claimant's relevant work history, and the absence of objective medical evidence to support the complaints." *Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008) (quoting *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)). An ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence, *Halverson v. Astrue*, 600 F.3d 922, 931-32 (8th Cir. 2010), but such evidence is one factor that the ALJ may consider. *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008). The ALJ need not explicitly discuss each factor as long as the ALJ acknowledges and considers the factors before discounting the claimant's subjective complaints. *Goff*, 421 F.3d at 791. "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000).

When an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, the court should normally defer to the ALJ's credibility determination. *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003). It is not my role to re-weigh the evidence. *See* 42 U.S.C. § 405(g); *see also Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000) ("[I]f, after reviewing the record, [the Court] find[s] that it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Commissioner's] findings, [the Court] must affirm the decision of the Commissioner.")

(citations and quotations omitted). However, in reviewing the ALJ's credibility determination, I must consider the evidence that both supports and detracts from the ALJ's decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012) (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). It is not appropriate to reverse the ALJ's decision simply because some evidence would support a different conclusion. *Perks*, 687 F.3d at 1091. An ALJ is not required to discuss every piece of evidence that was submitted, and an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered. *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998). I must defer to the ALJ's determination regarding the credibility of testimony as long as it is supported by good reasons and substantial evidence. *Id.* (citing *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006)).

### b.    *The ALJ's findings*

At her hearing before the ALJ, and throughout the course of the disability application process, Eddington maintained that, because of her depressive disorder, low intelligence, and her ADHD, she is unable to return to work. AR 67-69. The ALJ found that Eddington's statements concerning the intensity, persistence, and limiting effects of her symptoms from her mental impairments were not entirely credible. After referencing the *Polaski* factors and examining some of the medical and opinion evidence, the ALJ found as follows:

> After careful consideration of the evidence, the undersigned finds the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible to the extent they are inconsistent with the above residual functional capacity assessment.

AR 20. The ALJ found inconsistencies in the record, stating:

Regarding the claimant's alleged mental impairments, review of the medical record indicated that the claimant sought rather limited treatment throughout the period under consideration. Of note, the claimant reported that she stopped seeking treatment due to believing her symptoms had resolved after minimal treatment. The undersigned finds the claimant's failure to seek consistent counseling, psychological, or psychiatric treatment to significantly erode the credibility of her allegations. Moreover, mental status examinations of record were generally unremarkable, showing adequate memory, concentration, attention, and cognitive abilities. One consultative psychologist found that the claimant failed to describe any significant mental health symptoms, with another examining psychologist noting that limitations were due to the claimant's lack of motivation (Exhibits 2F; 13F).

AR 21. The ALJ also noted Eddington's ability to maintain an independent lifestyle, stating:

In addition, the claimant has generally reported daily activities that are not limited to the extent one might expect considering her allegations of disabling symptoms and limitations. Contrary to her allegations while being examined by Dr. Christiansen (See Exhibit 21F), the claimant reported having no problems performing personal care independently (Exhibit 8E, pg. 4). She further reported being able to prepare meals on a daily basis, perform household chores including cleaning, laundry, ironing, moving, and raking, driving a car, going out alone, and shopping in stores for food and other items (*Id.* at 5-6). Notably, the claimant testified to caring for her medically ill mother, preparing meals for her and for her brother's children (Hearing Testimony). Socially, she reported spending time with others, going to the mall, going to Wal-Mart, watching television, and playing video games. She reported spending her time hanging out with friends, going places, and with spending time with her boyfriend. However, she noted some problems getting along with family, friends, and neighbors due to "I disagree a lot." Notably, she reported doing well with authority figures unless they made

her angry *(Id.* at 7-9).  The claimant further reported being able to follow instructions, being able to handle some kind of stress, and not liking changes in routine *(Id.* at 9).  Based on these admitted activities, the undersigned finds that the claimant can perform work activity consistent with the assessed residual functional capacity above.

AR 21.

### c.    Analysis

Eddington argues the ALJ failed to properly consider her subjective allegations.  In doing so, she makes two main points.  She argues that the ALJ failed to articulate his reasons for discounting her subjective allegations, and she argues the ALJ improperly discounted the third party reports from her family.  The Commissioner, obviously, disagrees and argues that the ALJ's ruling is supported by substantial evidence.

Based on my review of the record, I conclude that, for the most part, the ALJ gave detailed reasons for discounting Eddington's subjective complaints and limitations.  The ALJ gave at least three separate reasons why Eddington's subjective allegations are not supported by the record.[6]  The ALJ discussed Eddington's activities of daily living and noted that she engaged in many activities that do not support her claims of disabling mental limitations.  AR 21.  Eddington drives, does errands, and does household chores such as cleaning and mowing.  AR 74.  Although Eddington has most often lived with one or both of her parents, she has lived alone with her romantic partner and with friends.

---

[6]  A fourth reason, not discussed by the ALJ, is Eddington's work history.  Eddington's work history consists of sporadic employment in hotels and fast food restaurants.  She admitted in the record that she has often lost her jobs because she became "bored."  AR 455.  The Eighth Circuit Court of Appeals has recognized that a poor work record prior to the alleged onset date can be a factor tending to show the claimant lacks motivation to work.  *Fredrickson v. Barnhart*, 359 F.3d 972, 976 (8th Cir. 2004) (the ALJ properly considered claimant's poor work history and low earnings as a credibility factor).  However, because the ALJ did not consider that issue, neither will I.

AR 60, 551.  Eddington watches television, reads, and plays video games for fun.  AR 529.  Significantly, Eddington testified about taking care of her disabled mother.  AR 71.  Eddington will do errands for her mother, like picking up her nieces and nephews that her mother babysits, and will also go to her mother's house to prepare meals for her mother and her family.  AR 70-72, 578.

The Eighth Circuit Court of Appeals has stated that the claimant's ability to perform basic life functions can be a factor considered by the ALJ in determining if the claimant's allegations are credible.  *See Baker v. Barnhart*, 457 F.3d 882, 893 (8th Cir. 2006) (the Eighth Circuit Court of Appeals considered the fact that the claimant was capable of full self-care, drove a car every day, shopped, and ran a number of errands as one factor in determining if claimant's allegations were credible).  However, a "limited ability to complete light housework and short errands does not mean [a claimant] has 'the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" *Tilley v. Astrue*, 580 F.3d 675, 682 (8th Cir. 2009) citing *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc) *abrogated on other grounds by Higgins v. Apfel*, 222 F.3d 504, 505 (8th Cir. 2000).  In this case, the ALJ properly considered, and cited, Eddington's ability to perform basic life tasks as one factor in determining if her allegations were credible.

The ALJ also noted Eddington's failure to regularly treat for her various medical issues.  As can be seen in the review of the medical records set out above, there is no possible, factual dispute that Eddington failed to seek regular medical treatment.  Over the five years' worth of medical records presently before me, Eddington never sought regular, and continuing, medical care for her allegedly disabling symptoms.  Eddington only saw her counselor two times over the course of four years.  The ALJ properly relied

on Eddington's lack of treatment in his credibility assessment.[7] *See Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008), stating, "[t]he ALJ noted that [claimant] did not seek medical treatment between March 2000 and April 2005. . . The ALJ determined that such evidence is inconsistent with complaints of persistent and debilitating symptoms. . . [T]he ALJ's credibility assessment was proper." The ALJ also noted Eddington's non-compliance with medication, specifically, that she never took ADHD medication and quit taking depression medication when she thought her symptoms improved. AR 21. The Eighth Circuit Court of Appeals has recognized that non-compliance can be a basis for discounting a claimant's credibility. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007). Accordingly, the ALJ properly used it as one factor that weighed against Eddington's credibility.

Finally, as was discussed in some detail in the previous section, the ALJ stated that the medical record did not support Eddington's allegations. With the exception of Dr. Christiansen, none of the providers appearing in the record opined that Eddington had disabling/severe symptoms. The medical record is replete with references to Eddington having low normal to normal cognitive function and, at most, moderate issues with attention, pace, and social functioning. As was discussed above, some providers, such as Dr. Rogers and Dr. Bonnstetter, specifically opined that many of Eddington's issues were related to personality, motivation, and boredom, rather than the severe impairments of record. It is not my job to reweigh the evidence. Rather, the question is whether the ALJ gave good reasons for his opinion and whether the opinion is supported by substantial evidence. In this case, the ALJ gave at least three clear reasons, which

---

[7] In her brief, Eddington argues that her mental issues were the reason she failed to seek treatment. However, Eddington does not cite evidence to support that argument. Moreover, there are multiple indications in the record that her parents were willing to help Eddington seek treatment if she wanted treatment.

are supported by citations to the record, that tend to show that the claimant's subjective allegations were not credible. Accordingly, the ALJ's finding is supported by substantial evidence.

Eddington also argues that the ALJ should have given greater weight to the third party reports provided by her family. The ALJ gave little weight to the reports provided by Eddington's mother, sister, and boyfriend, stating:

> The record additionally contains reports submitted by the claimant's mother, sister, and significant other (See Exhibits 6E; 13E; 14E; 15E), which are generally supportive of the claimant's allegations. However, these reports do not establish that the claimant is disabled. More specifically, the claimant's mother, sister, and significant other are not medically trained to make exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms, the accuracy of the information provided is questionable. Moreover, by virtue of the relationship with the claimant, these reports cannot be considered as coming from disinterested third party witnesses whose statements would not tend to be colored by affection for the claimant and a natural tendency to agree with the symptoms and limitations the claimant alleges. Most importantly, significant weight cannot be given to the third party report because it, like the claimant's allegations, is simply not consistent with the preponderance of the opinions and observations by medical doctors in this case, as discussed above.

AR 22. Although the statements of Eddington's family generally support her subjective allegations, the ALJ was entitled to discount that corroborating testimony for the same reason he used to discredit Eddington's. Eddington has alternately lived with her mother and her boyfriend, and is often tasked with taking care of her mother. Clearly, they all have an interest in a disability finding. *See Black v. Apfel*, 143 F.3d 383, 387 (8th Cir. 2006) (ALJ's failure to give specific reasons for disregarding testimony of the claimant's

husband was inconsequential, as the same reasons the ALJ gave to discredit claimant could serve as basis for discrediting the husband). The ALJ provided detailed reasons for his credibility findings, and those findings are substantially supported by the medical evidence. Accordingly, I must deny Eddington's argument.

### III.    CONCLUSION

After a thorough review of the entire record and in accordance with the standard of review I must follow, I conclude that the ALJ's determination that Eddington was not disabled within the meaning of the Act is supported by substantial evidence in the record. Accordingly, the decision of the ALJ is **affirmed**. Judgment shall be entered in favor of the Commissioner and against Eddington.

**IT IS SO ORDERED.**

**DATED** this 24th day of September, 2015.

_Mark W. Bennett_
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA